1
2
3
4
5
6
7
8
9
10

GIBSON, DUNN & CRUTCHER LLP
WAYNE W. SMITH, SBN 54593
WSmith@gibsondunn.com
MATTHEW E. LILLY, SBN 218143
MLilly@gibsondunn.com
JARED M. TOFFER, SBN 223139
JToffer@gibsondunn.com
KRISTOPHER P. DIULIO, SBN 229399
KDiulio@gibsondunn.com
3161 Michelson Drive
Irvine, California 92612-4412
Telephone:  (949) 451-3800
Facsimile:  (949) 451-4220

Attorneys for Defendants
ANDREW H. PARNES and
STEPHEN J. SCARBOROUGH

11

UNITED STATES DISTRICT COURT

12

CENTRAL DISTRICT OF CALIFORNIA

13

WESTERN DIVISION

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| VINOD PATEL,<br><br>            Plaintiff,<br><br>     v.<br><br>ANDREW H. PARNES and<br>STEPHEN J. SCARBOROUGH,<br><br>            Defendants. | CASE NO. CV 07-5364-MMM-(SHx)<br><br>**CLASS ACTION**<br><br>**DEFENDANTS ANDREW H. PARNES AND STEPHEN J. SCARBOROUGH'S NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[*Request for Judicial Notice; Declaration of Kristopher P. Diulio  filed concurrently herewith*]<br><br>**HEARING**:<br>Date:     May 19, 2008<br>Time:    10:00 a.m.<br>Place:   Courtroom 780 |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ..................................................................................... 1

II. STANDARD PACIFIC AND THE HISTORIC BOOM AND
    DECLINE IN THE HOUSING MARKET ........................................... 2

  A.  Standard Pacific Is An Established Company That Had Been
      Building Homes For Decades Prior To The Record Run-up In
      Home Sales And Values Beginning In 2001. .............................. 2

  B.  Peaking in Mid-2005, There Was A Historic Boom in Home
      Sales and Values, And The Dramatic Downturn Was Not
      Anticipated. ................................................................................. 3

  C.  Standard Pacific Acknowledged The Possibility Of A Market
      Downturn, And Repeatedly Lowered Its Earnings Guidance In
      2006. ............................................................................................ 4

  D.  Standard Pacific Again Lowered Its Guidance In 2007, And
      Then Ceased Giving Guidance Altogether Due To Market
      Uncertainties ............................................................................... 7

III. THE COMPLAINT DOES NOT PLEAD A 10b VIOLATION WITH
     THE REQUISITE SPECIFICITY. ..................................................... 8

  A.  Plaintiffs' Puzzle-Plead Complaint Fails To Specifically
      Identify The Supposed Fraud. ..................................................... 9

  B.  Defendants' Forward-Looking Statements Are Protected By
      The PSLRA Safe Harbor............................................................ 10

    1.  Plaintiffs Rely On Forward Looking Statements To
        Support Their Claims. ........................................................ 11

    2.  The Statements Are Not Actionable Because They Were
        Accompanied By Meaningful Cautionary Language. .................. 12

    3   Plaintiffs Have Not Plead That Defendants Knew That
        Any Projections Were False Or Misleading When Made. ............ 12

i

# Table of Contents
## (Continued)

Page

a.    The Complaint contains no facts to support allegations that any guidance was false at the time it was issued. ....................................................... 14

b.    Throughout the class period Defendants *reduced* their guidance. ..................................................... 16

c.    Geographic diversification allegations are a red herring. .................................................................... 18

d.    Allegations regarding business decisions do not support a claim for securities fraud. .................................. 19

C.    Plaintiffs Fail To Satisfy The PSLRA's Stringent Requirements For Pleading Scienter. ..................................................... 20

1.    The Facts Alleged In the Complaint Create A Compelling Inference Of *Non* Fraudulent Intent. ................................ 21

a.    A slowing housing market does not provide a strong inference of scienter. ................................... 21

b.    Plaintiffs' allegations concerning "Cognos reports" do not support a strong inference of scienter. ................... 23

c.    Defendants' actions in response to a slowing housing market suggest that they were acting in the interests of shareholders. ..................................... 24

2.    Plaintiffs' Gratuitous Allegations Regarding Defendants' Stock Sales And Compensation Do Not Support Allegations Of Fraud. .................................................. 25

a.    There is nothing suspicious about Defendants' stock sales. ............................................................. 25

b.    Allegations concerning Defendants' compensation do not support a strong inference of scienter. ................... 27

# Table of Contents
## (Continued)

Page

D.   The Allegations From Plaintiffs' Confidential Witnesses Do Not Cure The Failure To Plead False Or Misleading Statements And Scienter. ........................................................................... 28

E.   The Complaint Fails To Plead Loss Causation By Not Identifying Any Corrective Disclosures And Corresponding Loss, As Required By *Dura*. .................................................... 30

F.   These Failures Also Doom Plaintiffs' Section 20(a) and 20(A) Claims. ....................................................................... 34

IV.   CONCLUSION ................................................................... 35

iii

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alfus v. Pyramid Technology Corp.*,
745 F. Supp. 1511 (N.D. Cal. 1990) ....................................................................... 35

*Bastian v. Petren Resources Corp.*,
892 F.2d 680 (7th Cir. 1990) .................................................................................. 34

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007) ............................................................................................ 33

*Cats v. Protection One, Inc.*,
2001 U.S. Dist. LEXIS 257256 (C.D. Cal. June 4, 2001) ..................................... 19

*Congregation of Ezra Sholom v. Blockbuster, Inc.*,
504 F. Supp. 2d 151 (N.D. Tex. 2007) ................................................................... 33

*Dura Pharmaceuticals, Inc. v Broudo*,
544 U.S. 342 (2005) ..................................................................................... 8, 30, 31

*Ferber v. Travelers Corp.*,
785 F. Supp. 1101 (D. Conn. 1991) ........................................................................ 28

*Glen Holly Entm't v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) ............................................................................ 18, 19

*In re AST Research Sec. Litig.*,
887 F. Supp. 231 (C.D. Cal. 1995) ........................................................................ 35

*In re Boeing Sec. Litig.*,
40 F. Supp. 2d 1160 (W.D. Wash. 1998) ............................................................... 10

*In re Compuware Sec. Litig.*,
386 F. Supp. 2d 913 (E.D. Mich. 2005) ................................................................. 32

*In re CornerStone Propane Partners, L.P. Sec. Litig.*,
355 F. Supp. 2d 1069 (N.D. Cal. 2005) .................................................................. 27

*In re Daou Sys. Sec. Litig.*,
411 F.2d 1006 (9th Cir. 2005) ................................................................................ 28

*In re Gilead Scis. Secs. Litig.*,
2006 U.S. Dist. LEXIS 32893 (N.D. Cal., May 12, 2006) .................................... 31

*In re Glenfed, Inc. Sec. Litig.*,
42 F.3d 15411 (9th Cir. 1994) ................................................................................ 16

*In re Initial Public Offering Secs. Litig.*,
399 F. Supp. 2d 261 (S.D.N.Y. 2005) ........................................................ 1, 22, 32

*In re iPass, Inc. Sec. Litig.*,
2006 U.S. Dist. LEXIS 7676 (N.D. Cal. Feb. 28, 2006) ....................................... 18

*In re McKesson HBOC, Inc. Secs. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................................. 28

*In re Network Assocs., Inc. II Secs. Litig.*,
2003 U.S. Dist LEXIS 14442 (N.D. Cal., March 25, 2003) .................................. 28

iv

# Table of Authorities
## (Continued)

Page(s)

*In re Northpoint Comm. Group, Inc. Secs. Litig.*,
221 F. Supp. 2d 1090 (N.D. Cal. 2002)................................................29, 30

*In re Omnicom Sec. Litig.*,
2008 U.S. Dist. LEXIS 6033 (S.D.N.Y. Jan. 29, 2008) ........................31

*In re PETsMART, Inc. Sec. Litig.*,
61 F. Supp. 2d 982 (D. Ariz. 1999) .......................................................27

In re Portal Software, Inc. Secs. Litig.,
2005 U.S. Dist. LEXIS 20214 (N.D. Cal. 2005) ...................................32

*In re Ramp Networks, Inc. Secs. Litig.*,
201 F. Supp. 2d 1051 (N.D. Cal. 2002) .................................................34

*In re Read-Rite Corp. Sec. Litig.*,
335 F.3d 843 (9th Cir. 2003) ...........................................................13, 21

*In re Silicon Graphics, Inc. Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) .......................................13, 21, 24, 26

*In re Splash Technology Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001)...........................................9, 10, 24

*In re St. Paul Travelers Sec. Litig. II,*
2007 U.S. Dist. LEXIS 40326 (D. Minn. June 1, 2007) .......................33

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 .........................................................................................22

*In re Syncor Inter'l Corp. Secs. Litig.*,
327 F. Supp. 2d 1149 (C.D. Cal. 2004) .................................................29

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ...............................................................13

*In re Wet Seal, Inc. Secs. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ...................................28, 29, 30

*In re Williams Sec. Litig.*,
496 F. Supp. 2d 1195 (D. Okla. 2007) ..............................................31, 34

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) .................................................................19

*Kensington Capital Mngm't v. Oakley, Inc.*,
1999 U.S. Dist. LEXIS 385 (C.D. Cal. 1999) ......................................11

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ..................................................................33

*May v. Borick*,
1997 WL 314166 (C.D. Cal. March 3, 1997)....................................9, 13

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ...............................................................26

*Plevy v. Haggerty*,
38 F. Supp. 2d 816 (C.D. Cal. 1998)......................................................28

# Table of Authorities
## (Continued)

Page(s)

*Powell v. Idacorp*,
2006 U.S. Dist. LEXIS 21831 (D. Id. Mar. 29, 2006) ............................ 32

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ...................................................... 21

*Teachers' Retirement System v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ...................................................... 35

*Teamsters Local 175 v. Clorox Co.*,
353 F.3d 1125 (9th Cir. 2004) .............................................. 11, 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
127 S.Ct. 2499 (2007)........................................................ 21, 25

*Weiss v. Amkor*,
2007 U.S. Dist. LEXIS 71688 (D. Ariz., Sept. 25, 2007) .................... 32

*Yourish v. California Amplifier*,
191 F.3d 983 (9th Cir. 1999) ........................................................ 9

**Statutes**

15 U.S.C. § 78u-4(b)(2) .......................................................... 9, 23

15 U.S.C. § 78u-4(e)(1) .............................................................. 34

15 U.S.C. § 78u-5(i)(a)(A)-(C) ...................................................... 11

FRCP 9(b) ............................................................................ 9

**Other Authorities**

H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess., at 53 (1995)............ 11

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on May 19, 2008, at 10:00 a.m., in Courtroom 780 of the above-entitled Court, located at 255 East Temple Street, Los Angeles, California, before the Honorable Margaret M. Morrow, Defendants Andrew H. Parnes and Stephen J. Scarborough ("Defendants"), by and through their attorneys of record, will and hereby do move this Court for an order dismissing Plaintiffs' Consolidated Class Action Complaint For Violations of Federal Securities Laws ("Complaint") for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and, specifically, for not meeting the pleading requirements of Rules 8 and 9(b), and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

The Complaint attempts to allege securities fraud in connection with Defendants' employment by Standard Pacific Corp. ("Standard Pacific"), but fails because it (i) employs improper puzzle-pleading, (ii) seeks liability for statements that are protected by the PSLRA safe harbor, (iii) fails to allege any actionable false or misleading statements; (iv) fails to allege scienter with particularity, and (v) fails to allege loss causation.

This Motion is based on this Notice of Motion and Motion, the concurrently filed Memorandum of Points and Authorities, Request for Judicial Notice, and any other matters of which the Court may take judicial notice, other documents on file in this action, and any oral argument of counsel.

1

1         This Motion is made following the conference of counsel pursuant to L.R. 7-3

2   that took place on February 29, 2008.

3                                              Respectfully submitted,

4   Dated:  March 10, 2008           GIBSON, DUNN & CRUTCHER LLP

5                                              WAYNE W. SMITH
MATTHEW E. LILLY

6                                            JARED M. TOFFER
KRISTOPHER P. DIULIO

7

8

9                               By:_____/s/ Kristopher P. Diulio_____
                                     Kristopher P. Diulio

10                              3161 Michelson Drive
Irvine, California 92612-4412

11                              Telephone:  (949) 451-3800
Facsimile:  (949) 451-4220

12

13                              Attorneys for Defendants

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.   INTRODUCTION

> If downturns in stock prices based on such mundane events as failures to meet forecasts and downward revisions of forecasts were legally sufficient to constitute disclosures of securities fraud, then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure caused their losses.  That would effectively convert the securities laws into an insurance policy for investors.

*In re Initial Public Offering Secs. Litig.*, 399 F. Supp. 2d 261, 266-267 (S.D.N.Y. 2005) ("*IPO*").  That is exactly what Plaintiffs are attempting to do in this case—plead securities fraud by hindsight based on allegations of missed projections and stock declines caused by a downturn in the housing market.  Plaintiffs seek an insurance policy from Defendants for losses sustained as a result of this downturn.

Plaintiffs' Complaint is an effort to make a case for securities fraud where none exists.  The Complaint contains at least the following fatal deficiencies which require its dismissal for failure to plead fraud with specificity under the PSLRA:

- Plaintiffs' Complaint is a classic example of puzzle-pleading—whereby Plaintiffs allege a series of lengthy statements followed by a recitation of alleged falsehoods and misrepresentations—all of which lack any unifying bond.  As a result, the reader is left to guess as to which specific statements Plaintiffs allege to be false and misleading.

- Plaintiffs do not identify any statements attributable to Defendants that were false or misleading when made.  Plaintiffs rely solely on projections, forecasts, and opinions concerning future business prospects, which they allege later proved to be incorrect due to the decline in the housing market.  The law does not recognize such fraud by hindsight.

- Plaintiffs improperly plead scienter by hindsight, failing to establish that Defendants possessed actual knowledge that their forward-looking projections and statements were false or misleading ***when made***.

- Plaintiffs fail to establish loss causation.  First, Plaintiffs fail to specifically identify any corrective disclosures.  Second, Plaintiffs allege, without factual support, that the entire stock price decline during the class period and beyond was caused by Defendants' fraud, without tying any specific decline to any

1

specific corrective disclosure and without disaggregating non-fraud factors from the decline.

Plaintiffs' Complaint should be dismissed because the securities laws are not intended to provide insurance against losses incurred during a market downturn.

## II.   STANDARD PACIFIC AND THE HISTORIC BOOM AND DECLINE IN THE HOUSING MARKET

At the beginning of this decade, the housing industry found itself in the midst of a record growth in home values and sales, which was followed by a steep decline that was unexpected in both timing and rate of decrease.  But while the decline was unexpected, it certainly was no secret.  Industry observers – from analysts to newspaper reporters – continually informed the market that home sales and prices were in decline (although opinions differed as to how long and to what depths the market would fall).  Standard Pacific, too, informed its investors that the housing market was first slowing down, and then in a downturn.  Standard Pacific also informed its investors that the market decline was causing the company's sales to fall in comparison to prior periods, and several times lowered its sales and earnings guidance during the putative class period as the market continued to decline.  And at all times Standard Pacific's public statements accurately reflected its views of the market at the time they were made.

## A.   Standard Pacific Is An Established Company That Had Been Building Homes For Decades Prior To The Record Run-up In Home Sales And Values Beginning In 2001.

Standard Pacific is one of the nation's largest and most successful homebuilding companies.  Founded in 1965, the company began its operations building subdivisions in Southern California.  Over the next 42 years, Standard Pacific expanded its operations into states from coast to coast.  Today, the company builds homes in 31 major markets throughout California, Nevada, Arizona, Colorado, Texas, the Carolinas, and Florida.  RJN, Ex. C (2007 10-K) at 1.  In its 42-year history, Standard Pacific has built homes for over 100,000 families.  *Id.*

Also in its 42-year history, Standard Pacific has gone through several cycles of

rising and declining housing markets – most recently a historic boom from 2001-2005, followed by an unprecedented downturn which may not yet have found its floor. Among those leading Standard Pacific through these changing markets are Defendants Steve Scarborough (the Company's CEO, President and Chairman of the Board) and Andrew Parnes (the Company's CFO), who have worked for the Company for 27 years and 18 years, respectively. *Id.* at 9.

**B.**   **Peaking in Mid-2005, There Was A Historic Boom in Home Sales and Values, And The Dramatic Downturn Was Not Anticipated.**

The housing boom began in 2001 and peaked in about July 2005, and during that time there were significant increases in U.S. home prices.  RJN, Ex. SSS (January 28, 2008 Associated Press Article); RJN, Ex. III (September 5, 2006 JMP Securities Analyst Report) at 2; RJN, Ex. RRR (July 12, 2007 Business Week Article);  RJN, Ex. TTT (FDIC Paper, U.S. Home Prices: Does Bust Always Follow Boom, February 10, 2005).

The increase in housing prices naturally increased earnings for Standard Pacific. Standard Pacific discussed its increased income in its third quarter 2005 10-Q, filed November 2, 2005, stating that the increase reflected the impact "of a number of positive economic factors and demographic trends combined with the positive results from our growth initiatives in our existing markets and expansion into new geographic markets over the past seven years."  RJN, Ex. A at 19 (2005 10-Q).  In fall 2005, many analysts, looking at the same positive economic factors and demographic trends, were suggesting that there was no end in sight to the housing boom.  RJN, Ex. JJJ (Sept. 27, 2005 Chicago Tribune Article) ("The nation's housing market continues to roll along at a historic pace with few signs that a pair of hurricanes and soaring fuel prices have done much to hamper activity."); RJN, Ex. YY (October 28, 2005 Citigroup Analyst Report) ("Overall, we believe the strong results from SPF provide further indication of ongoing fundamental strength at the large public builders.").

Other observers were less optimistic, and questioned whether the market was

slowing, although most continued to have an overall positive outlook on the future of the housing market.  RJN, Ex. KKK (October 7, 2005 Orange County Register Article) ("[T]he local home market . . . cooling from its torrid pace," but "other economic news . . . suggest[s] that no dramatic fall is in the works.").  This same sentiment was echoed by analysts who covered homebuilders' stocks:

> We forecast that unit sales of new homes will remain flat in 2006 versus 2005 levels and then decline 10% in 2007 and a further 5% in 2008 as the industry moves back toward historical average turnover and replacement rates in the United States.  In past downturns, unit sales have typically contracted as much as 50% but we believe that the banking liquidity crises that contributed to prior cyclical downturns are unlikely to materialize in our forecast retrenchment, hence allowing for a more modest reversion to the mean than the historical "over-shooting" to the downside.

RJN, Ex. ZZ (Nov. 17, 2005 Goldman Sachs Analyst Report) at 5; *see also* RJN, Ex. LLL (Dec. 20, 2005 Associated Press Article) (discussing Fannie Mae prediction that "housing market jitters [would] reverse a five-year run," but "even Fannie's predicted level for 2006 would be the third-strongest year on record for home sales"); RJN, Ex. MMM (Dec. 15, 2005 Associated Press Article) (acknowledging slowing toward "normalized levels"); RJN, Ex. NNN (Dec. 30, 2005 Thomson Financial News Article) ("[M]any analysts are looking for a 'soft landing' for the housing market in 2006 with interest rates moving higher and home demand cooling in areas that have seen the most price appreciation.").

The uncertainty that stemmed from conflicting economic indicators and which was reflected in articles and analyst reports made it impossible for anyone, including Standard Pacific, to predict the exact scope of any market slowdown.

**C.**   **Standard Pacific Acknowledged The Possibility Of A Market Downturn, And Repeatedly Lowered Its Earnings Guidance In 2006.**

Standard Pacific acknowledged the growing uncertainty of predicting the housing market in its 2005 10-K, filed on February 24, 2006.  In that filing, the company

4

expressly warned investors that a slowdown or downturn, while far from certain, were distinct possibilities:

> Although the homebuilding business has historically been cyclical, we have experienced significant price appreciation in many of our markets for a number of years, and the industry has not experienced a downturn during this time in these markets. ***This, along with other factors such as decreased affordability, has caused some people to conclude that homes are overvalued and that prices may decline. If the prices for new homes do not continue to increase, or even decline, this could harm both our revenues and margins.***

RJN, Ex. A at 9 (2005 10-K). This warning was acknowledged by analysts and others who covered the market. RJN, Ex. OOO (Feb. 3, 2006 Thomson Financial News Article) (reporting "slump" in Standard Pacific's orders and that "[m]any analysts are forecasting that the housing market will cool this year after several years of rapid increases in home sales and prices."); RJN, Ex. PPP (March 22, 2006 Associated Press article) ("The housing market is expected to slow modestly this year . . . ."). Others, however, remained bullish, which illustrates the uncertainties associated with predicting the future of the housing market as of February 2006. *See, e.g.*, RJN, Ex. BBB, (January 23, 2006 JMP Securities Analyst Report) ("Contrary to the bears who expect a complete collapse in units and margins, we continue to believe the public builders will be able to demonstrate that the builders' geographic and product diversification and stronger balance sheets will allow them to sustain their earnings, although at a slower growth rate than previously anticipated.").

By the end of the first quarter of 2006, Standard Pacific began to see "evidence that many of [its] housing markets [were] moderating from the unsustainable pace of the past few years." RJN, Ex. L (April 27, 2006 Press Release) at 1. In response, Standard Pacific announced in April 2006 that it was lowering its earnings guidance for the year. *Id*. Standard Pacific also discussed its decreased demand in its first quarter 10-Q, filed May 8, 2006, informing investors that it had "seen demand for new homes slow down in most of [its] markets, particularly [its] largest markets in California, Florida and

Arizona, since the latter half of 2005 resulting in a decline in new home order activity." RJN Ex. E at 25-26 (1Q 2006 10-Q). Standard Pacific further told investors that new orders companywide for the first quarter of 2006 were down 8% from the first quarter 2005. *Id*. at 27.

Standard Pacific continued to keep the market apprised of the declining market and its effect on the company's operations during the second quarter of 2006, announcing in a June 2, 2006 press release that new orders were down 41% from April/May 2005, "driven in large part by an increase in the Company's cancellation rate and continued softening of demand in many of the Company's larger markets." Compl. ¶ 51. In the same press release, Standard Pacific announced that it expected to "lower its earnings and delivery guidance" for 2006. *Id*.

On July 27, 2006, Standard Pacific issued a press release announcing its financial results for the second quarter of 2006. Standard Pacific was very candid in its press release concerning the state of the market and its effects on the company:

> The changing market tone that surfaced at the end of 2005 has continued to evolve during the first half of 2006, and we are clearly facing an increasingly competitive environment in most of our major markets across the country. We are impacted by growing levels of both new and existing home inventories, a steadily increasing interest rate environment, reduced affordability and weaker homebuyer confidence. All of these conditions have resulted in lower sales rates and higher levels of cancellations which have given rise to a greater use of incentives and other forms of discounting.

*Id*. ¶ 52. Standard Pacific further warned investors that "[i]t [was] difficult to predict when market conditions [would] stabilize and improve in [its] primary markets." *Id*. As a result, Standard Pacific announced that it was again lowering its earnings guidance for 2006. *Id*. ¶¶ 44, 52; RJN, Ex. M (July 27, 2006 Press Release) at 2.

This pattern of a continued market decline and lowered earnings guidance by the company repeated itself in the third quarter of 2006. Specifically, in a September 8, 2006 press release, Standard Pacific again announced that it expected to lower its 2006 earnings and delivery guidance "[i]n light of lower than expected order levels for the

6

first two months of the 2006 third quarter and deteriorating market conditions . . . ."
Compl. ¶ 65.  Then, on October 26, 2006, Standard Pacific again lowered its 2006
earnings guidance.  *Id.* ¶ 66; RJN, Ex. N (October 26, 2006 Press Release) at 1-2.

**D.  Standard Pacific Again Lowered Its Guidance In 2007, And Then Ceased Giving Guidance Altogether Due To Market Uncertainties.**

The housing market continued to worsen throughout 2006.  In its 2006 10-K,
filed on February 23, 2007, Standard Pacific announced that the company was
experiencing a marked downturn.  RJN Ex. C at 10 (2007 10-K).  The company also
bluntly announced that there could "be no assurance that [its] earnings and financial
position will not be further impacted if the challenging conditions" in several of
Standard Pacific's markets continued.  *Id.* at 11.

By March 2007, the weight of the sub-prime mortgage meltdown had
unexpectedly landed on the housing market, making it even harder to predict just how
far the housing market would fall.  RJN, Ex. CCC (March 22, 2007 Raymond James
Analyst Report); RJN, Ex. DDD (April 1, 2007 Goldman Sachs Analyst Report) ("We
also believe that the breakdown of the sub-prime mortgage market is likely to contribute
to further weakness in the overall housing market (although somewhat difficult to
quantify), and may lengthen the cycle.").  In response to the resulting further downturn
in the industry from this unexpected development, Standard Pacific once again revised
its guidance downward and continued to warn investors about the market decline,
stating in April 2007: "During the first quarter of 2007, our operations continued to be
impacted by the changing market tone that surfaced at the end of 2005, became more
pronounced during the course of 2006 and gave rise to a rapid decline in demand in
most of the major housing markets across the country."  RJN, Ex. P (April 26, 2007
Press Release) at 1-2; RJN, Ex. H (Standard Pacific 1Q 2007 10-Q) at 26.

The collapse of the sub-prime mortgage industry accelerated the decline in the
housing market to a new, unforeseen low in June and July 2007 and no one knew how
much lower it would go.  In response, Standard Pacific announced on July 26, 2007 that

it was withdrawing its previous guidance, and would no longer issue guidance in the future, due to the uncertainties in the market.  RJN, Ex. Q (July 26, 2007 Press Release); *see also* RJN, Ex. I (Standard Pacific 2Q 2007 10-Q).

In sum, the putative class period followed an unprecedented run up in housing prices across the country, and coincided with an equally historic decline that included a virtual collapse of the sub-prime mortgage industry.  Importantly for purposes of this Motion, Standard Pacific publicly acknowledged the risks and uncertainties associated with these uncharted waters throughout the putative class period, and repeatedly lowered its earnings and delivery guidance as the market continued to fall.  That Standard Pacific – like every other market observer – was not able to predict the depth, timing, and extent of this market decline does not give rise to a fraud claim.  To hold Defendants liable for securities fraud based on these facts would be precisely the type of fraud by hindsight that has been soundly rejected by the courts.

## III.    THE COMPLAINT DOES NOT PLEAD A 10b VIOLATION WITH THE REQUISITE SPECIFICITY.

Plaintiffs' Complaint fails to state a claim because it does not specifically identify any class period statements as being false or misleading, it attempts to assert liability for protected forward-looking statements, the facts as alleged do not create a strong inference of scienter, and it does not identify any corrective disclosure and corresponding stock price decline caused by the alleged fraud.  In order to survive a motion to dismiss, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[1]  15 U.S.C. § 78u-

---

[1] The basic elements of a section 10b claim include: (1) a material misrepresentation or omission; (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss.  *See Dura Pharmaceuticals, Inc. v Broudo*, 544 U.S. 336, 342 (2005).

8

4(b)(2); *see also* FRCP 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999). Plaintiffs fail to meet this burden.

**A.      Plaintiffs' Puzzle-Plead Complaint Fails To Specifically Identify The Supposed Fraud.**

The Complaint should be dismissed because it is a classic example of prohibited puzzle-pleading, in which Plaintiffs quote extensively from public statements throughout the class period, without specifying the ***particular*** statements that are purportedly false or misleading. *See, e.g.*, Compl. ¶¶ 29-34. These passages are followed by a paragraph that generally alleges that the preceding statements were false and misleading, but without identifying any specific statements. *See, e.g., id.* ¶ 35. This style of pleading "renders it exceedingly difficult to discern precisely which statements are alleged to be misleading." *In re Splash Technology Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073 (N.D. Cal. 2001). Instead, the Court and Defendants are left to guess as to what, exactly, the basis is for Plaintiffs' claim.

Courts in the Ninth Circuit have repeatedly held puzzle-pleading to be unacceptable. *See id.* at 1074-75 (collecting cases); *May v. Borick*, 1997 WL 314166, at *7 (C.D. Cal. March 3, 1997) ("[W]e are loathe to allow plaintiffs to tax defendants . . . with the burden of solving puzzles in addition to the burden of formulating an answer to their complaint.") (citations and internal quotations omitted). Failure to specify the allegedly false statements is not a mere technicality, but is required to ensure plaintiffs match allegedly misleading statements with the contemporaneous knowledge required to establish scienter. *See Gold v. Morrice*, No. CV 07-931 DDP (JTLx) (C.D. Cal. Jan. 31, 2008) Order at 6 (dismissing complaint that does not "clearly identify the allegedly false statement or which of the factual allegations support an inference that particular statement are false or misleading") (attached as Ex. 1).

Here, Plaintiffs' 73-page Complaint contains no fewer than 64 paragraphs of purported false and misleading statements, consisting of long passages from press releases, SEC filings, transcripts of conference calls and other documents. Compl. ¶¶

29-93.  Rather than identify specific false statements and explain why they are allegedly false, Plaintiffs follow several pages of rote quotations (portions of which—often without apparent reason—are in bold and italicized typeface) with essentially the same set of conclusory allegations that the preceding "positive statements, assurances and forecasts" were "false and misleading."  Compl. ¶¶ 35, 43, 50, 59-64, 73-74, 80-81, 89, 92-93.  Plaintiffs make no attempt to identify which statements were allegedly false or misleading when made, or otherwise explain how their conclusory allegations of falsity tie back to any specific statement made by Defendants.  As in *Splash*, the reader is left to "attempt to determine, by paging back and forth among the respective paragraphs, which statements (or portions thereof) are alleged to be false and misleading."  *Splash*, 160 F. Supp. 2d at 1074.  Further, that certain portions of the statements "have been highlighted is not a reliable guide to determining which statements are alleged to be false, as bolded statements sometimes do not turn out to be actionable."  *Id.*  The Court should dismiss the Complaint for this reason alone.

**B.   Defendants' Forward-Looking Statements Are Protected By The PSLRA Safe Harbor.**

The statements on which Plaintiffs apparently rely cannot form the basis for a 10b violation because they are protected forward-looking statements.  The PSLRA carves out a safe harbor for forward-looking statements, defined as statements containing projections of revenues, income, or earnings per share, management's plans or objectives for future operations, and predictions of future economic performance.  *See* 15 U.S.C. § 78u-5(i)(a)(A)-(C).  The purpose of this safe harbor is to encourage the disclosure of forward-looking information.  H.R. Conf. Rep. No. 104-369, 104th Cong. 1st Sess., at 53 (1995).  A forward-looking statement cannot be the basis for 10b liability if either it "is accompanied by meaningful cautionary language, or the plaintiff fails to prove that the person making the statement made it with actual knowledge that the statement was false and misleading."  *In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1167 (W.D. Wash. 1998); *see also Teamsters Local 175 v. Clorox Co.*, 353 F.3d 1125,

1    1132 (9th Cir. 2004); *Kensington Capital Mngm't v. Oakley, Inc.*, 1999 U.S. Dist.

2    LEXIS 385, at *3 (C.D. Cal. 1999).

3      Applying those principles here, Plaintiffs do not allege anywhere in the

4    Complaint that Defendants made any statements that misrepresented any historic or

5    current fact or circumstance.  Rather, Plaintiffs' theory of fraud is based entirely on the

6    theory that Defendants made statements concerning *future* events, including "earnings

7    forecasts, earnings per share ('EPS') estimates and projected home sales."  Compl. ¶ 3

8    (emphasis added).  Plaintiffs then allege, with the benefit of hindsight, that Defendants'

9    forecasts and projections turned out to be wrong due to a declining housing market.  In

10   so alleging, Plaintiffs fail both prongs of the safe harbor analysis.

### 1. Plaintiffs Rely On Forward Looking Statements To Support Their Claims.

13    Although Plaintiffs do not specifically identify which of Defendants' public

14   statements allegedly support their claims, it is clear that Plaintiffs rely on forward

15   looking statements.  For example, following their long quotations of Standard Pacific's

16   SEC filings, press releases, and earnings calls, Plaintiffs allege that Defendants'

17   "positive statements, assurances, and forecasts" were false – clearly evidencing a

18   reliance on forward looking statements.  Compl. ¶¶ 35, 43, 50, 59-64, 73-74, 80-81, 89,

19   92-93.  Plaintiffs also highlight several statements throughout the Complaint –

20   presumably in an attempt to imply that they are important to Plaintiffs' claims – that are

21   unquestionably forward looking in nature, for example:

22    &bull; "Looking forward to 2006, we are targeting 13,000 deliveries . . .  (Compl. ¶ 39);

24    &bull; "For 2006, we are maintaining our earnings guidance at $6.90 per share, a 10% year-over-year increase . . . " (*id*.);

25    &bull; "[W]e plan to open approximately 140-145 new projects during the year, up 55% over 2005, which should help drive a 35% year-over-year increase in our community count by the end of the year and support our deliveries for 2006 and 2007 . . . " (*id*. at ¶ 44);

27    &bull; "So again, we're excited about the new communities and their positions . . . ." (*id*. at ¶ 45).

11

These and each of the other statements apparently relied upon by Plaintiffs to support their claims are clearly forward looking in nature.

**2.  The Statements Are Not Actionable Because They Were Accompanied By Meaningful Cautionary Language.**

Plaintiffs' allegations are insufficient because Defendants' statements, as alleged in the Complaint, were accompanied by meaningful cautionary language.  For example, Plaintiffs attempt to predicate liability on forecasts disclosed during earnings conference calls, which included the following statement:

> This conference call and accompanying slide presentation contains forward-looking statements, including statements about the Company's outlook, growth opportunities, market orders, backlog, liquidity and land position, as well as it's expected deliveries, revenues, earnings, margins, leverage, pricing, SD&A rate, share county, land purchases and communities. . . .

> We caution you that forward-looking statements involve risks and uncertainties and there are a number of facts that could cause our actual results to differ materially from those that are contained in or implied [by] these statements.  For a list of certain of these factors, please see our press release . . .

RJN, Exs. OO-UU at 2 (Call Transcripts).  The press releases and SEC filings cited by Plaintiff included similar warnings and a list of factors that may impact the forecasts: "local and general economic and market conditions, including consumer confidence, employment rates, the cost and availability of mortgage financing, and stock market, home and land valuations . . . cancellations of purchase contrasts by homebuyers; the cyclical and competitive nature of our business," etc.  RJN, Exs. LL-NN (Press Releases), A-R (SEC filings).  This cautionary language prevents these statements from predicating securities fraud liability.  *See Clorox Co.*, 353 F.3d at 1132.

**3   Plaintiffs Have Not Plead That Defendants Knew That Any Projections Were False Or Misleading When Made.**

Even if Plaintiffs established that the alleged false or misleading statements were not protected by cautionary language, the Complaint would still fail because Plaintiffs have not plead the required "great detail" of "all facts" forming the basis for their belief

that any actionable forward-looking statements were made with ***actual knowledge*** that they were false.  *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 983 (9th Cir. 1999); *see also In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003). Plaintiffs fail this prong of the safe harbor analysis for several reasons.

First, the requirement that a plaintiff plead a defendants' actual knowledge that a forward looking statement was false presupposes that the statement was false at the time it was made.  Here, Plaintiffs fail to specifically identify a single statement attributable to either Defendant that was allegedly false when made.  To the contrary, and as Plaintiffs acknowledge in the Complaint, Defendants repeatedly told the market that Standard Pacific's sales, and the market as a whole, were declining.

In addition, Plaintiffs do not adequately allege that Defendants had actual knowledge that their forward-looking projections were unrealistic.  Rather, the Complaint paints a picture of a company prospectively lowering expectations in a dynamic and uncertain market.  Indeed, Plaintiffs acknowledge that Defendants actually took steps to ***reduce*** the Company's projections as the housing market evolved.  Compl. ¶¶ 39, 44, 52.  These allegations do not support liability under the PSLRA.  *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1091 (9th Cir. 2002) (Because "forecasts are unquestionably forward-looking statements," plaintiffs "must have alleged facts that would create a strong inference that the defendants made the forecasts with 'actual knowledge . . . that the statement[s were] false or misleading' at the time made."); *May v. Borick*, 1997 WL 314166, at *6 (C.D. Cal., March 3, 1997) ("The mere fact that an optimistic prediction is not borne out over time does not establish securities fraud.").

Nor do Plaintiffs' allegations concerning Standard Pacific's geographic diversification or other management decisions pass muster.  As with every other category of statements identified by Plaintiffs, Plaintiffs fail to identify any false statement concerning Standard Pacific's diversification or decisions made by management.  Plaintiffs further fail to allege that Defendants knew any such statement to be false when made.  And in any event, the pertinent facts were disclosed.

13

Plaintiffs, therefore, have failed to meet their burden to allege that Defendants had actual knowledge that any relevant statements were false.

### a. The Complaint contains no facts to support allegations that any guidance was false at the time it was issued.

Acknowledging that the Complaint attempts to predicate fraud on forward-looking statements, Plaintiffs attempt to argue that the Company's projections were "made without evidence." *See, e.g.*, Compl. ¶¶ 35, 50, 80. For example, Plaintiffs allege that Standard Pacific's guidance during the putative class period was false because "overall demand for Standard Pacific's new homes was softening" by the third quarter of 2005 (*id*. ¶ 35), and that sales were "slowing to a trickle in many Standard Pacific Divisions" by the second quarter of 2006 (*id*. ¶ 50). These and similar allegations fail to support Plaintiffs' fraud claim because Plaintiffs do not allege that Defendants ever said otherwise. While some of Standard Pacific's projections may have turned out to be inaccurate *with the benefit of hindsight*, Plaintiffs do not allege that those projections were false *when made*. This critical distinction is completely ignored by Plaintiffs, and is fatal to their fraud claim. *See IPO*, 399 F. Supp. 2d at 266-267 (holding that "failures to meet forecasts and downward revisions" are not sufficient to assert a claim of securities fraud).

Further, Plaintiffs' core theory of falsity – declining home sales – was fully disclosed to the market. For example, in its 2005 10-K, Standard Pacific confirmed to investors that it was experiencing declines in sales:

> New orders companywide for the fourth quarter of 2005 totaled 2,154 homes (excluding 64 from unconsolidated joint ventures), an 11 percent decrease from the 2004 fourth quarter. ***The overall decline in orders resulted from the slowing of demand in some of our markets from the unsustainable pace of the past several quarters***, and to a lesser degree, from a delay in a number of new community openings during the quarter. Since the start of 2006, we have continued to see a slowing of sales activity, particularly in markets which have experienced significant price increases and investor-driven demand in recent years, such as California and Florida.

RJN Ex. A (2005 10-K) at 28 (emphasis added); *see also* § II, *supra*.  The Complaint itself reveals similar disclosures throughout the putative class period, including:

- "[W]e continued to see evidence that many of our housing markets are moderating from the unsustainable pace of the past few years. . . . our unit orders were down 8% year over year."  Compl. ¶ 44.

- "We have adjusted our business plan for 2006 to respond to changing market conditions and to reflect our view that the demand for new homes will adjust to more normalized and sustainable levels resulting in generally lower absorption rates."  *Id.*

- "Our cancellation rate . . . for the 2006 first quarter was 24 percent, up from year earlier rate of 17 percent."  *Id.* ¶ 48.

- "We are impacted by growing levels of both new and existing home inventories, a steadily increasing interest rate environment, reduced affordability and weaker homebuyer confidence.  All of these conditions have resulted in lower sales rates and higher levels of cancellations which have given rise to a greater use of incentives and other forms of discounting."  *Id.* ¶ 52.

- "Southern California [cancellations] we were in the mid 40s.  Last year we were in the mid 20s.  Let's see, Florida [cancellations], low 30s.  But that was in kind of the low teens last year.  And then Arizona [cancellations were] over 50% for the second quarter and it was a single digit percentage last year, so that was up the most significant rate."  *Id.* ¶ 54.

- "Overall, sales rates continue to be sluggish in many markets reflecting continued high inventory levels and buyer's concerns over home price stability."  *Id.* ¶ 82.

Ignoring these and other clear warnings from the company, Plaintiffs repeat their mantra throughout the Complaint—based on unsupported allegations of CW1—that internal projections were overstated by at least 25%.  *Id.* ¶ 60.  In addition to not alleging with any specificity the basis for this allegation, the facts, as alleged in the Complaint, appear contradictory.  For example, Plaintiffs allege that projections were overstated (*id.* ¶¶ 50, 60), but also allege that Defendants "directed Standard Pacific's divisions to revise their 2006 forecasts downward by 20% to reflect the declining market."  *Id.* ¶ 50.  Far from supporting a claim for fraud, allegations that Defendants

15

directed Standard Pacific's divisions to lower forecasts in a declining market (even if the allegations were true), would not support an inference of fraud. Indeed, lowering forecasts, as Standard Pacific did repeatedly in making public projections, is precisely what one would expect the company to do during a market decline.

Further, the Complaint is devoid of any support for the allegations that Defendants knew that the prospective projections were overstated at the time they were made. *See In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548-49 (9th Cir. 1994) (In the face of intervening events—such as a declining market—plaintiff must explain "why the disputed statement was untrue or misleading when made."). Rather than evidence fraud, an increased variance between past projections and actual sales are reasonably explained by the slowing housing market—a publicly disclosed fact. Plaintiffs also fail to explain what the actual overstated projections were, why they were overstated, and how Defendants knew they were overstated.

### b. Throughout the class period Defendants *reduced* their guidance.

It is mere speculation for Plaintiffs to assume that Defendants could somehow look into the future and divine exactly what would happen to the housing market in the coming year. The facts alleged demonstrate that Defendants made forecasts based on the information currently available and, in the midst of a softening market, reduced those forecasts as more information became available. Indeed, Standard Pacific reduced its delivery guidance *five times* during the putative class period, and reduced its earnings guidance *three times*. *See* RJN, Ex. K (February 2, 2006 Press Release) (reducing delivery guidance for 2006 from 14,000 to 13,000); RJN, Ex. L (April 27, 2006 Press Release) (reducing delivery guidance for 2006 from 13,000 to 12,300, and earnings guidance from $6.90 to $6.50); RJN, Ex. M (July 27, 2006 Press Release) (reducing delivery guidance for 2006 from 12,300 to 10,400, and earnings guidance from $6.50 to $5.10-$5.40); RJN, Ex. N (October 26, 2006 Press Release) (reducing delivery guidance for 2006 from 10,400 to 10,200-10,300, and earnings guidance from $5.10-$5.40 to

16

$4.20-$4.30); RJN, Ex. P (April 26, 2007 Press Release) (reducing delivery guidance for 2007 from 8,700 to 8,150); *see also* RJN, Ex. P (April 26, 2007 Press Release) (reducing revenue guidance for 2007 from $3.3-3.2 billion to $3.1 billion).  Standard Pacific expressly advised investors that these reductions in guidance were due to deteriorating market conditions and slowing home sales.  *See, e.g.*, Compl. ¶ 52 (citing "growing levels of both new and existing home inventories, a steadily increasing interest rate environment, reduced affordability and weaker homebuyer confidence"); *id.* ¶ 65 (citing "further weakening of demand for new homes").  Standard Pacific further warned investors that, despite its lowered expectations, actual results could still fall short of projections:

- Guidance "does not reflect additional inventory impairment charges or write-offs of deposits and capitalized preacquisition costs for abandoned properties."  *Id.* ¶ 66.

- The "regular quarterly project budget update and inventory impairment analysis could lead to additional charges if the market conditions change or we are not able to achieve our projected absorption rate with our existing pricing structure."  *Id.*

- Evaluation of "land controlled in our pipeline . . . could lead to additional deposit and cost write-offs."  *Id.*

- "If general or local market conditions deteriorate further, or our competitors change their pricing strategies, we may have to further reduce home prices or adjust our discounts and concessions which may, in turn, trigger additional impairments."  *Id.* ¶ 76.

Then finally, when the market deteriorated to the point at which it was no longer feasible to give guidance to the market, Standard Pacific ceased doing so "[b]ecause of the uncertainties [then] impacting the homebuilding industry . . . ."  *Id.* ¶ 94

In sum, rather than mislead the market as to the true state of the company, Standard Pacific unambiguously informed investors that it was experiencing declines in sales, and that decreasing demand was likely to negatively impact future earnings. These and other disclosures conclusively refute any allegation that Defendants knew any public projections to be false when made.

17

| | |
|---|---|
| 1 | **c.      Geographic diversification allegations are a red herring.** |
| 2 | Plaintiffs also attack Defendants' forward-looking statements that geographic |
| 3 | diversification put the Company in a "better position going forward."  *Id.* ¶ 35.  This |
| 4 | argument fails for several reasons.  As an initial matter, there is no allegation that the |
| 5 | Company was not diversifying in areas outside of California.  Indeed, Plaintiffs |
| 6 | acknowledge that Standard Pacific "operates in 31 metro markets in California, Florida, |
| 7 | Arizona, the Carolinas, Texas, Colorado, Nevada and Illinois."  *Id.* ¶ 1. |
| 8 | Furthermore, the Complaint is devoid of any allegations attacking the |
| 9 | reasonableness of Defendants' opinions that this diversity put the company in a "better |
| 10 | position going forward."  *See id.* ¶¶ 29-30.  And, in any event, opinions that the |
| 11 | company is a "better position" are simply not actionable.  *See Glen Holly Entm't v.* |
| 12 | *Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003); *In re iPass, Inc. Sec. Litig.*, 2006 |
| 13 | U.S. Dist. LEXIS 7676, at *10-12 (N.D. Cal. Feb. 28, 2006). |
| 14 | Plaintiffs attempt to bolster their claim by citing the accusations of CW3.  Compl. |
| 15 | ¶ 50.  Based on purported information from CW3, Plaintiffs allege that Standard Pacific |
| 16 | "embarked on an expansion effort to build several new communities" in California's |
| 17 | Central Valley region, despite (unnamed) employees' concerns that that market was |
| 18 | slowing.  *Id.*  But whether or not expansion into the Central Valley ultimately turned out |
| 19 | to be a good business decision, for purposes of pleading a claim of securities fraud, this |
| 20 | allegation is irrelevant.  The Company disclosed its plan to the market (Compl. ¶ 30), |
| 21 | and while Plaintiffs now contend it was not the right management decision to be making |
| 22 | at the time, there are no allegations that connect this or any other geographic expansion |
| 23 | with any false or misleading projection. |
| 24 | Likewise, Plaintiffs attack statements that the Company viewed "Las Vegas as a |
| 25 | good market going forward."  *Id.* ¶¶ 89, 92.  Again, this statement, along with similar |
| 26 | opinions, are not actionable because "generalized, vague and unspecific assertions" of |
| 27 | corporate optimism are "mere puffery" that cannot trigger an action under the federal |
| 28 | securities laws.  *See Glen Holly Entm't v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. |

2003).  Also, the Complaint is devoid of any facts demonstrating that, at the time, Defendants did not view Las Vegas as a good market going forward.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) ("Plaintiffs cannot use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud.").  In short, the Complaint does not plead any facts demonstrating that Defendants made any false or misleading statements regarding geographic diversification with actual knowledge that those statements were false when made.

### d.  Allegations regarding business decisions do not support a claim for securities fraud.

Plaintiffs further allege that various business practices support their fraud allegations.  But these business practices are not connected to any allegedly false or misleading statements, nor do they demonstrate the actual knowledge necessary to predicate liability on Defendants' forward looking statements.  *See Cats v. Protection One, Inc.*, 2001 U.S. Dist. LEXIS 25726, at *35 (C.D. Cal. June 4, 2001) (To state a claim for securities fraud, "Plaintiffs must plead more than a mere disagreement with [a company's] business judgment.").  For example, Plaintiffs, through CW4, claim that the company "began offering extra incentives," even though the Company had explicitly disclosed this fact to the market.  Compl. ¶ 45, 50.  Equally unavailing is the allegation that Standard Pacific "began laying off both sales representatives and loan officers."  *Id*. ¶ 50.  The market was well aware of the slowing market and that a concomitant reduction in staff was possible and, in fact, was confirmed by the Company in its public statements.  *Id*. ¶ 76.

Similarly, Plaintiffs' repeated allegations that Defendants did not "implement changes suggested by [an unidentified] consulting company" (*id*. ¶ 73) fail to include the requisite specificity.  For example, Plaintiffs include no allegations identifying who the consulting company was, why it was hired, what its recommendations were, who the recommendations were made to, who refused to implement the recommendations, and why the recommendations were not followed.  And, in any event, this allegation is not connected to any alleged false or misleading statement.

Further, the details Plaintiffs do provide concerning the mystery consultant are contradictory and internally inconsistent. On the one hand, Plaintiffs attack the independence, and therefore the reliability, of the consultant by alleging that, "the 'independent' consultant firm was partially owned by Controller Stephen's brother and was personally approved to perform the audit by Insider Defendant Scarborough." *Id.* ¶ 7. But in the very next paragraph, Plaintiffs allege that "defendants Scarborough and Parnes refused to implement the improvements to the accounting and finance system that the consultants had recommended." *Id.* ¶ 8. Thus, Plaintiffs inconsistently allege that the consultant lacked independence, but that Defendants should be faulted for refusing to follow the consultant's (presumably biased) advice.

The Complaint also omits facts necessary to draw any relevant inference from this allegation. For example, Plaintiffs provide no basis for CW1's assertion that the consultant was hired, "because Company executives knew they had allowed the companies Standard Pacific acquired to operate too much on their own" or how that reason is relevant to the alleged fraud in this case. *Id.* ¶ 60. Nor do Plaintiffs allege that Defendants caused Standard Pacific to misrepresent any information contained in its financial statements, rendering irrelevant any decision not to implement improvements to the company's accounting and finance system. Finally, the allegation that Bill Larkin, a former Director of Risk Management, resigned when Defendants "refused to implement the improvements" (*id.* ¶ 73) lacks any detail, is unrelated to any statements made by Defendants, and contains no explanation as to how this resignation demonstrates that any statement was false.

## C. Plaintiffs Fail To Satisfy The PSLRA's Stringent Requirements For Pleading Scienter.

Plaintiffs' allegations of a slowing housing market and Defendants continual acknowledgement of that fact do not come close to supporting a reasonable inference of scienter. To adequately plead scienter, a plaintiff must show that the defendant "acted with intentionality or deliberate recklessness or, where the challenged act is a forward

20

looking statement, with actual knowledge . . . that the statement was false or misleading." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (internal quotations and citations omitted).  A complaint must include "allegations *of specific contemporaneous* statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements *when made*." *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003) (emphasis added) (citations omitted).

Here, Plaintiffs allege **no** specific facts to show that Standard Pacific was worse off than the industry, that Defendants knew that to be the case, or that they lied about it. Rather, Plaintiffs' Complaint improperly alleges fraud by hindsight.  That the market fell more quickly than Defendants—or any other seasoned market analyst—expected does not establish fraud.  *See Silicon Graphics*, 183 F.3d at 988 ("Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight.'").

### 1.    The Facts Alleged In the Complaint Create A Compelling Inference Of *Non* Fraudulent Intent.

A plaintiff must "state with particularity the facts giving rise to a strong inference that the defendant acted with the requisite state of mind."  15 U.S.C. § 78u-4(b)(2).  For an inference of scienter to be strong, it "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2504-05 (2007).  In conducting this analysis, a court must "engage in a comparative evaluation; it must consider, not only inferences urged by the  plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." *Id*. at 2404.  Applying these standards here, Plaintiffs have not sufficiently alleged scienter.

### a.    A slowing housing market does not provide a strong inference of scienter.

Plaintiffs' theory of scienter rests on the assumption that the Defendants could look into the future and predict precisely when and to what extent the housing market was going to decline.  Plaintiffs allege in conclusory fashion that Defendants acted with

21

scienter when making statements about Standard Pacific's earnings and sales forecasts, geographic diversity, and the health of its markets because favorable projections are somehow inconsistent with a slowing market.  Compl. ¶¶ 35, 43, 50, 59, 73, 80, 89, 93. These allegations are insufficient to establish scienter.

As an initial matter, the mere fact that the housing market was "softening," is insufficient to demonstrate that Defendants possessed actual knowledge that any of their statements or projections during the class period were false or misleading at the time they were made.  As analysts indicated during the putative class period, the slowing of the housing market did not necessarily mean that Standard Pacific's growth would stop, but rather, that the market could "normalize" and continue to grow at healthy levels. *See* RJN, Ex. MMM (Dec. 15, 2005 Associated Press article), Ex. NNN (Dec. 30, 2005 Thomson Financial News article); *see also* RJN, Ex. JJJ (Sept. 27, 2005 Chicago Tribune Article) ("The nation's housing market continues to roll along at a historic pace with few signs that a pair of hurricanes and soaring fuel prices have done much to hamper activity."), Ex. XX (October 28, 2005 Citigroup Analyst Report) ("Overall, we believe the strong results from SPF provide further indication of ongoing fundamental strength at the large public builders."); Ex. YY (October 28, 2005 Wachovia Analyst Report); Ex. BBB (January 23, 2006 JMP Securities Analyst Report).

Moreover, the mere fact that Defendants continued to issue projections that were not sufficiently dire for Plaintiffs does not establish that Defendants acted with the requisite scienter.  *See, e.g.*, *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 ("companies are not required to predict the future"); *IPO*, 399 F. Supp. 2d at 266-67. As set forth more fully above (§ III.B.3, *supra*), Plaintiffs fail to allege specific facts that demonstrate that Defendants had actual knowledge that their prospective projections were false or that the housing market was affecting Standard Pacific more than had been disclosed to the market.

### b. Plaintiffs' allegations concerning "Cognos reports" do not support a strong inference of scienter.

Plaintiffs rely heavily on internal reports, which they call Cognos reports, to support their allegations of scienter. According to Plaintiffs, Cognos reports reflected sales forecasts from Standard Pacific's divisions, and were distributed weekly to Defendants. Compl. ¶ 4. Plaintiffs further allege that these reports revealed that divisional forecasts fell short of actual results in 2006, and that Standard Pacific should have reduced its sales projections further than it did as a result. *Id.* ¶ 61. Plaintiffs' allegations concerning the Cognos reports fail for several reasons.

First, although Plaintiffs go to great lengths building up the importance of the Cognos reports, those reports do not call into question any then-current numbers or future projections. At best, Plaintiffs allege that these reports revealed to Defendants that as the market worsened, and when reviewed with the benefit of hindsight, actual results from (unspecified) divisions within the company fell short of those divisions' forecasts in 2006. In other words, Defendants were allegedly aware in 2006 that at least some divisions had missed their prior forecasts. But even if these allegations are accepted as true, Plaintiffs do not tie any specific Cognos report to any specific statement attributable to Defendants, much less explain how the information in any Cognos report rendered any company projection to be false *when made*.

Second, Plaintiffs' own allegations establish that, at the same time that sales at Standard Pacific's divisions were falling short of forecasts, the company repeatedly lowered its delivery and earnings guidance throughout 2006 and into 2007. *See* § III.B.3.b, *supra*. Thus, to the extent that the Cognos reports can be said to be relevant to Standard Pacific's overall projections at all, the only reasonable inference is that Defendants took the company's divisions' past performance into account when they made projections of future results to the market.

Third, it is apparently Plaintiffs' position that the Cognos reports support a strong inference of scienter because, although Standard Pacific did reduce its guidance during

the putative class period, the reports suggested that those reductions should have been greater.  *See* Compl. ¶ 61.  However, even if the Cognos reports did reveal that *historical* divisional forecasts fell short of actual results, Plaintiffs do not specifically allege why *future* results would necessarily fall short of (already reduced) companywide projections.  Indeed, even Plaintiffs acknowledge that several significant factors affected future results, including interest rates, mortgage default rates, homeowner insurance premiums, and other "macro-economic factors."  *Id.* ¶¶ 2-3, 12, 62, 74.  Plaintiffs do not even attempt to explain how unidentified past divisional results somehow superseded all other factors in making future projections.

Fourth and finally, stripped of inference, Plaintiffs' allegations concerning the Cognos reports lack sufficient detail to support a strong inference of scienter.  When, as here, a claim for securities fraud is based on the theory that forward looking statements were knowingly false because a defendant was in the possession of inconsistent information contained in internal reports, it is incumbent on a Plaintiff to allege "*specific facts* concerning the people who made or received the reports, the contents of the reports, the dates of transmissions, the manner in which they were transmitted or the bases for plaintiffs' knowledge."  *Splash*, 160 F. Supp. 2d at 1070 (emphasis added); *see also Silicon Graphics*, 183 F.3d at 983.  Here, Plaintiffs allege no facts explaining (among other things) who generated Cognos reports, the source(s) of the data contained in the reports, or how precisely the reports were purportedly incorporated into companywide projections.  Without details such as these, and for all of the other reasons set forth above, Plaintiffs' allegations concerning the Cognos reports are insufficient to support a strong inference of scienter.

> **c.   Defendants' actions in response to a slowing housing market suggest that they were acting in the interests of shareholders.**

The facts alleged in the Complaint actually belie any suggestion that Defendants defrauded the market.  Plaintiffs themselves allege that Defendants responded to the softening market by lowering division forecasts by 20%, hiring an independent

24

consultant, and expanding and diversifying the Company's operations.  Compl. ¶¶ 7, 35, 50.  These allegations do not support a "strong inference" of scienter.  Indeed, the company's active land acquisitions and formation of joint ventures serve to **negate** a strong inference of fraud.  The only reasonable inference to be drawn from these facts is that Defendants believed the market would continue to absorb, at some level, new homes.  Surely, had Defendants truly believed that the housing market would decline even faster than the company projected, they would not have intentionally exacerbated the problem by expanding into additional markets.  As Scarborough succinctly put it (and which Plaintiffs acknowledge in the Complaint), "we wouldn't be entering the markets if we felt like the fundamentals were not there."  *Id.* ¶ 30.  To assign wholly irrational motives to this conduct—as Plaintiffs' Complaint requires—is prohibited by the PSLRA.  *See Tellabs*, 127 S.Ct. at 2510 ("Congress did not merely require plaintiffs . . . to allege facts from which an inference of scienter rationally *could* be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a 'strong' – i.e. powerful or cogent – inference.") (emphasis in original).

> **2.      Plaintiffs' Gratuitous Allegations Regarding Defendants' Stock Sales And Compensation Do Not Support Allegations Of Fraud.**

Plaintiffs seek to bolster their fraud allegations by alleging that Defendants and other "Company insiders" sold Standard Pacific stock during the putative class period. Compl. ¶¶ 111-12.  Ignoring the time and volume of these sales, as well as other important factors, Plaintiffs baldly allege that Defendants had the "motive and opportunity" to commit fraud.  Plaintiffs' conclusory allegations concerning Defendants' stock sales fall well short of supporting a strong inference of fraud.

> **a.      There is nothing suspicious about Defendants' stock sales.**

As an initial matter, the Court need not consider Plaintiffs' allegations concerning Defendants' stock sales at all because Plaintiffs do not even attempt to allege facts showing that the sales were suspicious in timing or amount.  Plaintiffs' "insider trading" allegations consist solely of listing Defendants' stock sales during the class period, including the date, number of shares sold, sale price, and total proceeds for each sale.

Compl. ¶¶ 111-12.  Plaintiffs, however, must allege *some* facts casting suspicion on these sales.  *See Ronconi*, 253 F.3d at 436-37.  The lack of any such detail renders Plaintiffs' insider trading allegations meaningless.

Further, even if Plaintiffs had included sufficient allegations to put Defendants' stock sales at issue, Defendants' sales would not support a strong inference of fraud as a matter of law.  In order to determine whether stock sales are suspicious, and therefore potentially support a strong inference of fraud, courts consider three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history.  *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).  Plaintiffs have failed to meet their burden for several reasons.

First, Plaintiffs' allegation that Defendants and "other Company insiders" sold 145,350 shares of stock is misleading.  Compl. ¶ 112.  Plaintiffs do not identify any insiders other than Defendants, and in any event, the sales of other insiders are irrelevant to Defendants, as they cannot possibly serve as motive for the Defendants to commit securities fraud.  Parnes and Scarborough, the only defendants, combined sold only 70,350 shares, not 145,350 shares.

Second, the amount and percentage of Standard Pacific shares sold by Defendants does not support a strong inference of scienter, as both Defendants sold only a tiny portion of their total holdings during the putative class period.  As of March 5, 2007, Scarborough held 2,223,710 Standard Pacific shares, including options, yet he sold only 25,100 shares (1.1%).  RJN, Ex. S (April 9, 2007 Schedule 14A Proxy Statement) at 31-32; Compl. ¶ 112.  As of March 5, 2007, Parnes held 317,898 Standard Pacific shares, including options, yet he sold only 45,250 shares (14%).  *Id.* at 31-32; Compl. ¶ 112.  Thus, both Defendants retained the overwhelming majority of their holdings in Standard Pacific during the class period.

Third, Plaintiffs have failed to meet their burden to show that Scarborough and Parnes were not following prior trading patterns.  *See Silicon Graphics*, 183 F.3d at 986

("insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.") (internal citations omitted).  In the 21-month putative class period, Scarborough sold 25,100 shares.  During the nine previous months, he sold about the same number of shares, 25,334 shares.  RJN, Exs. T-U (Scarborough Form 4s).  Likewise, Parnes sold 45,250 shares during the putative class period, but sold 67,886 shares in the 14 months prior.  RJN, Exs. V-KK (Parnes Form 4s).  Both Defendants sold comparable numbers of shares – indeed somewhat higher numbers – prior to the start of the class period than they did during it.

Fourth and finally, Plaintiffs have also failed to meet their burden to show that the timing of the sales supports a strong inference of scienter.  Nearly all of Parnes's sales, over 37,000 shares, took place from November 8 to November 30, 2006.  Compl. ¶ 112. In contrast, Scarborough made nearly all of his sales, 22,000 shares, almost six months later.  *Id*.  Clearly, there was no common plan or recognition of impending doom that caused Defendants to start dumping their stock.

### b. Allegations concerning Defendants' compensation do not support a strong inference of scienter.

In yet another failed attempt to plead scienter, Plaintiffs allege that the Defendants attempted "to preserve their positions at the helm of this failing Company for another few years so as to collect their lucrative cash bonuses and compensation packages."  Compl. ¶ 15.  This allegation fails because evidence of compensation and salary linked to the performance of the company does not support a strong inference of scienter.  "The Ninth Circuit has clearly held that incentives to enhance business prospects and executive compensation incentives are insufficient allegations of scienter."  *In re CornerStone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1091 (N.D. Cal. 2005); *see also In re PETsMART, Inc. Sec. Litig.*, 61 F. Supp. 2d 982, 998-99 (D. Ariz. 1999); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 833-34 (C.D. Cal. 1998)

(citing *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995)); *Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1107 (D. Conn. 1991).

Moreover, Plaintiffs fail to plead any particularized facts as to how these "lucrative cash bonuses and compensation packages" were triggered, their amount, or any other specific details about the compensation.  As a result, these allegations do not support Plaintiffs' scienter allegations.

**D.    The Allegations From Plaintiffs' Confidential Witnesses Do Not Cure The Failure To Plead False Or Misleading Statements And Scienter.**

Plaintiffs rely heavily on confidential witness ("CW") allegations to support their claims, but they do not remedy the failure to specifically plead falsity or scienter. Compl. ¶¶ 4-9, 35, 43, 50, 59-64, 73-74.  In order to satisfy the strict pleading requirements of the PSLRA, CWs must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *In re Wet Seal, Inc. Secs. Litig.*, 518 F. Supp. 2d 1148, 1170 (C.D. Cal. 2007) (quoting *In re Daou Sys. Sec. Litig.*, 411 F.2d 1006, 1015 (9th Cir. 2005) (emphasis added)).  A "plaintiff's failure to identify the sources by name may somewhat reduce the weight to be given information from such unnamed sources."  *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000).  Courts in the Ninth Circuit have examined the following factors when determining whether CW allegations are plead with sufficient particularity: (1) how long the CW worked for the company, (2) what the CW's position entailed, (3) in what division of the company the CW worked, (4) to whom the CW reported, (5) and how the CW became privy to the alleged information.  *See In re Network Assocs., Inc. II Secs. Litig.*, 2003 U.S. Dist LEXIS 14442, at *34 (N.D. Cal., March 25, 2003).  Here, Plaintiffs fail to establish the reliability of any CW allegations.

First, Plaintiffs rely most heavily on CW1 to support their allegations of scienter, yet fail to provide the particularity required.  Plaintiffs describe CW1 as a "corporate administrator" who was responsible for "rolling up sales data from Standard Pacific's

28

1    various divisions."  Compl. ¶ 4.  Plaintiffs' description of CW1, however, falls far short

2    of supporting "the probability that a person in the position occupied by the source would

3    possess the information alleged."  *Wet Seal*, 518 F. Supp. 2d at 1170.  Specifically,

4    Plaintiffs provide no details describing CW1's experience in making financial and sales

5    projections that would provide a basis for her allegations that Standard Pacific's

6    projections were "over-optimistic."  Compl. ¶ 50.  Nor does the Complaint sufficiently

7    explain how CW1 "knew" that company projections from various regions were

8    overstated by 25% (particularly considering it was not CW1's job to create or audit the

9    projections from the field), or explain what "further investigation" CW1 allegedly

10   conducted on this topic.  *Id.* ¶¶ 6-9.

11          These and other allegations based solely on information from CW1 are

12   insufficient to support a claim.  Indeed, the details that Plaintiffs *do* provide about CW1

13   reveal that her allegations are based on nothing more than unreliable hearsay and

14   speculation.  *See, e.g.*, Compl. ¶ 4 (job duties entailed "rolling up sales data" not

15   creating the underlying projections or establishing the appropriate assumptions);

16   ("Controller Stephens, CW1 reported, spoke with Scarborough and Parnes about each

17   weekly report."); *id.* ¶ 9 ("CW1 raised these issues with Controller Stephens, who told

18   CW1 that the issue had been raised with senior executives, including Parnes and

19   Scarborough.").  When a plaintiff relies on CW allegations to plead a "strong inference"

20   of scienter, a basis for establishing the source's ***firsthand knowledge***, rather than

21   secondhand rumor, is required.  *See In re Northpoint Comm. Group, Inc. Secs. Litig.*,

22   221 F. Supp. 2d 1090, 1097 (N.D. Cal. 2002) (assertion that CW had direct access to

23   information "is not the same as saying that each witness actually had firsthand

24   knowledge of the information attributed.").  Plaintiffs' reliance on CW1's secondhand

25   knowledge is insufficient to establish the reliability of Plaintiffs' fraud allegations and

26   necessitates dismissal of the Complaint for failure to plead facts with the particularity

27   required.  *See In re Syncor Inter'l Corp. Secs. Litig.*, 327 F. Supp. 2d 1149, 1160 (C.D.

28   Cal. 2004) ("The mere fact that someone reported to another who reported to

29

1   [defendant] does not raise a strong inference that [defendant] knew of or participated in

2   the fraudulent practice").

3        Plaintiffs' allegations with respect to CWs 2-10 also lack the requisite

4   particularity.  The only information Plaintiffs provide with respect to CWs 2-10 are the

5   individuals' job titles.  *See* Compl. ¶¶ 43, 50, 62, 63, 81, 89.  But merely stating a CWs'

6   job title is insufficient.  *See Wet Seal*, 518 F. Supp. 2d at 1170-71 ("The Court simply

7   cannot infer that these job titles inherently conferred such expertise, particularly because

8   the witnesses purport to recount facts apparently invisible even to seasoned market

9   analysts."); *In re Northpoint,* 221 F. Supp. 2d at 1097 (dismissing complaint where it

10   "simply recited the eight witnesses' job titles, without offering adequate indications as

11   to their duties while in [the company's] employ.").  This rule is particularly applicable

12   here, as Plaintiffs allege that projections were made at both the divisional and

13   companywide level.  Yet with respect to CWs 2, 4, 6, and 8-10, Plaintiffs do not even

14   identify whether they worked at the corporate, regional, or divisional level, rendering it

15   impossible to tell whether these witnesses would even have access to the information

16   that they purportedly provided to Plaintiffs.  Compl. ¶¶ 43, 50, 63, 89.  And as for CWs

17   3, 5, and 7, Plaintiffs allege that CWs 3 and 7 were employed at the divisional level, and

18   that CW5 worked as a "Florida Area Manager."  *Id*. ¶¶ 50, 62, 81.  Thus, none of these

19   witnesses would have had access to companywide projections, *i.e*., the only projections

20   that Plaintiffs rely on as a basis for their claims.  Without additional particular facts

21   concerning these witnesses, the allegations attributed to the CW's do not save Plaintiffs'

22   Complaint.

23   **E.**  **The Complaint Fails To Plead Loss Causation By Not Identifying Any
      Corrective Disclosures And Corresponding Loss, As Required By *Dura*.**

24        Plaintiffs claim as damages the entire drop in price over the putative class period,

25   even though the entire industry was rapidly declining, in violation of the Supreme

26   Court's mandate in *Dura* that a plaintiff identify a corrective disclosure, corresponding

27   price drop caused by the disclosure, and disaggregate from that drop any decline caused

28

by factors unrelated to the fraud.  *Dura*, 544 U.S. at 342-343, 346.  The PSLRA confirms the mandatory requirement of a corrective disclosure, because the limitation on damages is triggered by the date of the corrective disclosure.  15 U.S.C. § 78u-4(e)(1).  Simply put, the Court and Defendants cannot determine from the Complaint Plaintiffs' damages theory because no corrective disclosure is identified.

The *Dura* decision established the requirements for pleading and proving loss causation in securities fraud cases.  *Dura*, 544 U.S. at 338.  As the Court explained, the securities laws are not designed "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  *Id*. at 345.  Thus, a plaintiff "must provide the defendant with 'fair notice of what the plaintiff's claim is and the grounds upon which it rests'" by adequately alleging that a "defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss."  *Id*. at 346.

Courts applying *Dura* have confirmed that a plaintiff must allege the revelation of a ***specific*** misrepresentation or omission caused a ***specific*** loss.  As explained by one court, "the law requires the disaggregation of confounding factors, [and] disaggregating only some of them cannot suffice to establish that the alleged misrepresentations actually caused Plaintiffs' loss."  *In re Omnicom Sec. Litig.*, 2008 U.S. Dist. LEXIS 6033, at *23 (S.D.N.Y. Jan. 29, 2008); *see also In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1266-67 (D. Okla. 2007) (Under *Dura,* "where a securities fraud plaintiff proceeds on a 'leakage' theory of corrective disclosure, he must still establish that the lower price reflects the fraud-related inflation and not 'changed economic circumstances, changed investor expectations, new-industry-specific facts, conditions or other events, which taken separately or together account for some or all of that lower price.'") (citations omitted); *In re Gilead Scis. Secs. Litig.*, 2006 U.S. Dist. LEXIS 32893, at *28-29 (N.D. Cal., May 12, 2006) (loss causation allegations fail where "the Court is left to speculate as to what portion of the eventual loss, if any, should be attributed to the disclosure or whether the loss was caused by other factors.") (citations

31

omitted).  Here, Plaintiffs have failed to meet this standard.

Plaintiffs' allegations fail to specify whether specific disclosures were corrective and, if they were corrective, which specific statements in those disclosures corrected specific prior misstatements, *i.e.* are "connected to the alleged fraud."  *See Weiss v. Amkor*, 2007 U.S. Dist. LEXIS 71688, at *23 (D. Ariz., Sept. 25, 2007) ("[C]ourts since *Dura* routinely reject complaints that fail to allege facts that, if established, demonstrate the critical link between the misrepresentations or omissions and the investor's loss."); *In re Compuware Sec. Litig.*, 386 F. Supp. 2d 913, 918 (E.D. Mich. 2005) (finding complaint failed to plead loss causation and that "[w]holly absent from its pleadings . . . is a nexus between the misrepresentations of which [plaintiff] complains and the losses they suffered"); *IPO*, 399 F. Supp. 2d at 308 ("[P]laintiffs' failure to allege a corrective disclosure of the falsity of defendants' opinions precludes any claim that such falsity caused their losses.").  In classic puzzle-pleading form, Plaintiffs merely quote lengthy portions of press releases and SEC filings and then state, in conclusory fashion, that "upon th[ese] announcement[s]" Standard Pacific's stock price declined.[2]  *See* Compl. ¶¶ 48-49, 66-67, 82-83, 90-91, 98-99.  But Plaintiffs' allegations fail to tie any of the various disclosures to a specific stock price decline caused by any corrective information.[3]  Instead, Plaintiffs state only in conclusory fashion that "[u]pon these

_____

[2]Not only have Plaintiffs failed to adequately allege loss causation under *Dura*, but they also have provided demonstrably false factual information in support of their allegations.  Plaintiffs allege in Paragraphs 46-49 that "shares of the Company's stock fell $4.01 per share, or approximately 14%" on May 8-10, 2006.  But records of Standard Pacific's opening and closing trading prices show that Standard Pacific opened at $32.00 on May 8, 2006 and closed at $31.67 on May 10, 2006 – a price drop of only $0.33.  RJN, Ex. UUU (Stock Prices).

[3]Plaintiffs improperly allege stock price declines **after** the October 27, 2005 through August 2, 2007 class period.  Compl. ¶¶ 99-101.  Numerous courts have found that post-class period corrective disclosures are not relevant to proving loss causation.  *See Powell v. Idacorp*, 2006 U.S. Dist. LEXIS 21831, at *13 (D. Id. Mar. 29, 2006); *In re Portal Software, Inc. Secs. Litig.*, 2005 U.S. Dist. LEXIS 20214, *49 (N.D. Cal. Aug. 10, 2005); *Congregation of Ezra Sholom v. Blockbuster, Inc.*, 504 F. Supp. 151, 167

[Footnote continued on next page]

shocking revelations of the serious problems with Standard Pacific's business that had been previously misrepresented or concealed, more of the remaining artificial inflation quickly came out of Standard Pacific's stock." *Id*. ¶ 103. These allegations are insufficient to meet Plaintiffs' pleading burden under *Dura* and its progeny and dictate that dismissal is appropriate.

Plaintiffs have also failed to plead any facts disaggregating stock price declines caused by non-fraud related factors from fraud related factors as required by *Dura*. Specifically, Plaintiffs allege in conclusory fashion, that "[t]he timing and magnitude of Standard Pacific's stock price decline negates any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct."[4] Comp. ¶ 116. Plaintiffs' conclusory allegations fail to explain how the impact on Standard Pacific's stock price from the general housing market decline can be appropriately separated from the alleged fraud. The need to disaggregate fraud from non-fraud factors is particularly critical in cases like this in which the industry has suffered a dramatic market decline. *See, e.g., Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the

_____

[Footnote continued from previous page]
n.9 (N.D. Tex. Aug. 22, 2007); *In re St. Paul Travelers Sec. Litig. II*, 2007 U.S. Dist. LEXIS 40326, *13 (D. Minn. June 1, 2007).

[4]Similarly, Plaintiffs allege that "the truth slowly entered the market and the artificial inflation in Standard Pacific's securities came out of the price as its stock collapsed to as low as $1.47 per share on January 11, 2008, a statistically significant, company-specific stock price decline not due to general stock market movements, changed economic conditions, changed investor expectations or company-specific negative events or information unrelated to the alleged misrepresentation and other fraudulent conduct." This conclusory allegation that merely recites the *Dura* standard is insufficient. *See Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) ("entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.").

33

prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.") (citations and internal quotations omitted); *Williams*, 496 F. Supp. 2d at 1264 (recognizing the obliteration of the publicly traded securities in the telecommunications sector and stating, "if the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established") (citations omitted); *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir. 1990) (the prospect that plaintiff's loss was caused by fraud decreases when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors).

Plaintiffs do not clearly and coherently allege any corrective disclosures, how those corrective disclosures affected Standard Pacific's stock price and how the stock price declines during the class period were caused by the revelation of prior misrepresentations as opposed to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" not "connected to" the alleged fraud. Plaintiffs' Complaint must be dismissed for failure to adequately plead loss causation.

**F.     These Failures Also Doom Plaintiffs' Section 20(a) and 20(A) Claims.**

Plaintiffs allege that Defendants are control persons under Section 20(a) of the Exchange Act. Section 20(a) of the Exchange Act provides for derivative liability of those who "control" others found to be primarily liable under the 1934 Act. 15 U.S.C. § 78t(a). Where a plaintiff alleges a Section 20(a) claim based on an underlying violation of Section 10b, the pleading requirements for the Section 20(a) claim are the same as they are for the § 10b claim. *See In re Ramp Networks, Inc. Secs. Litig.*, 201 F. Supp. 2d 1051, 1063 (N.D. Cal. 2002). Because Plaintiffs' Complaint does not adequately allege an underlying violation of Section 10b of Exchange Act, the Court should also dismiss Plaintiffs' Section 20(a) claim.

Likewise, Plaintiffs have failed to adequately plead a claim under § 20A against Defendant Parnes.  First, § 20A must be predicated on an independent violation of the Exchange Act, and Plaintiffs have failed to adequately plead a claim under § 10b or Rule 10b-5.  *Teachers' Retirement System v. Hunter*, 477 F.3d 162, 169 (4th Cir. 2007).  Second, § 20A requires not only contemporaneous trading, but the plaintiff must trade after Defendants trade the stock.  *Alfus v. Pyramid Technology Corp.*, 745 F. Supp. 1511, 1522 (N.D. Cal. 1990) ("First, a plaintiff's trade must have occurred ***after*** the wrongful insider transaction.") (emphasis added); *In re AST Research Sec. Litig.*, 887 F. Supp. 231, 234 (C.D. Cal. 1995) ("[T]he sale by an insider and ***subsequent*** purchase by an aggrieved party must occur on the same day.").  The Complaint is silent as to whether Plaintiffs traded after Defendant Parnes, thus Plaintiffs have failed to adequately plead a claim under § 20A.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant Defendants' Motion to Dismiss without leave to amend.  At a minimum, Defendants request Plaintiffs be required to craft a Complaint that meets the requirements of the PSLRA and Rule 9(b).

Dated:  March 10, 2008

GIBSON, DUNN & CRUTCHER LLP
WAYNE W. SMITH
MATTHEW E. LILLY
JARED M. TOFFER
KRISTOPHER P. DIULIO


By:_____/s/ Kristopher P. Diulio_____
            Kristopher P. Diulio

3161 Michelson Drive
Irvine, California 92612-4412
Telephone:  (949) 451-3800
Facsimile:  (949) 451-4220

Attorneys for Defendants

35

**CERTIFICATE OF SERVICE**

I hereby certify that on March 10, 2008, the attached document was electronically transmitted to the Clerk of the Court using the CM/ECF System which will send notification of such filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Susan G. Taylor | susant@csgrr.com |
| Joon M. Khang | jkhang@lhlaw.com |
| Darren J. Robbins | e_file_sd@csgrr.com |

Executed on March 10, 2008.

_____/s/ Kathy Desai_____
Kathy Desai